No. 24-2460

# In the United States Court of Appeals
# for the Ninth Circuit

JOSEPH MCGHEE,

*Plaintiff-Appellant,*

v.

STATE OF ARIZONA, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. CV-2023-08601-PCT-SRB
Hon. Susan Bolton

## APPELLANT'S OPENING BRIEF

Joseph McGhee
(No Address)
Flagstaff, AZ
(No Phone)
Email: *mcghee.v.forsman.et.al@gmail.com*

*Pro Se Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... v

DEDICATION ...................................................................... 1

FOREWORD ....................................................................... 2

INTRODUCTION ................................................................ 3

JURISDICTIONAL STATEMENT ....................................... 14

ISSUES PRESENTED .......................................................... 14

STATEMENT OF THE CASE ............................................... 15

    I.   Factual Background ................................................. 15

    II.  Procedural History ................................................. 19

SUMMARY OF THE ARGUMENT ...................................... 20

    I.   This Court should decide the qualified immunity argument left unaddressed by the district court ........................................ 21

STANDARD OF REVIEW .................................................... 23

ARGUMENT ....................................................................... 23

    I.   The district court erred in dismissing the Section 1983 claims ........ 23

        A.  Dismissal without leave to amend and without considering Appellant's pending motion was an abuse of discretion .......... 23

        B.  The *Heck* bar was applied to a nonexistent conviction ............ 29

        C.  The qualified immunity analysis fails as a matter of law ....... 31

D. Even if the court's dismissal on qualified immunity grounds was otherwise proper, such immunity lacks any basis in either history or law and violates the Supremacy Clause ...................................................................... 33

1. The historical and legislative background of Section 1983 clearly shows Congress's intent to foreclose immunity ............ 34

a. Reconstruction: Rainbows and Unicorns, It Was Not .....34

b. The 1866 Act: Congress Gets Tough .................................38

c. The 1871 Act: A Private Civil Remedy Applicable to All State Actors (Yes, *Even Judges*) ..................................42

d. The legislative record makes clear that Congress meant to abolish *all* common-law immunities .................44

2. Under its plain language, *all* common law immunities were abrogated by the 1871 Act ..................................................48

a. An unauthorized revision deleted this provision .............50

b. Absent repeal, this provision still controls ......................52

II. The Supreme Court's Section 1983 precedent has *never* been "binding" on this Court nor on any other lower federal court ...........55

A. *Stare decisis* is a doctrine, not a constitutional mandate ........ 55

B. This Court is *obligated* to follow the Constitution above all else—even conflicting Supreme Court precedent ..................... 58

1. The Supreme Court has no constitutional power to disregard a lawful act of Congress, which is exactly what qualified immunity does ............................................................ 58

2. Every federal judge takes a constitutionally mandated oath to support the Constitution, not clearly erroneous precedent ...................................................................................... 59

C. Only Congress, in the lawful exercise of its Article III power, can mandate lower federal courts' deference to "binding" Supreme Court precedent..........................................62

CONCLUSION.................................................................................65

STATEMENT OF RELATED CASES ..............................................67

CERTIFICATE OF COMPLIANCE..................................................68

CERTIFICATE OF SERVICE ........................................................69

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agostini v. Felton,*
  521 U.S. 203 (1997) .................................................................. 62

*Anderson v. Pac. Coast S.S. Co.,*
  225 U.S. 187 (1912) .................................................................. 54

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .............................................................. 49, 64

*Armstrong v. Rushing,*
  352 F.2d 836 (9th Cir. 1965) ..................................................... 24

*Barrow v. Hunton,*
  99 U.S. (9 Otto) 80 (1878) ........................................................ 28

*BE & K Const. Co. v. NLRB,*
  536 U.S. 516 (2002) .................................................................. 13

*Beets v. County of Los Angeles,*
  669 F.3d 1038 (9th Cir. 2012) ................................................... 23

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993) .................................................................. 22

*Briscoe* v. *LaHue,*
  460 U.S. 325 (1983) .................................................................. 36

*Brown v. Davenport,*
  596 U.S. 118 (2022) .................................................................. 64

*Carvalho v. Equifax Info. Servs., LLC,*
  629 F.3d 876 (9th Cir. 2010) ..................................................... 23

*Chapman v. Hous. Welfare Rights Org.*,
   441 U.S. 600 (1979) ................................................................ 52

*Chavez v. Robinson*,
   817 F.3d 1162 (9th Cir. 2016) ............................................... 32

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) ......................................................... 58, 59

*Christopher v. Harbury*,
   536 U.S. 403 (2002) ................................................................ 13

*Chudacoff v. Univ. Med. Ctr. of S. Nev.*,
   649 F.3d 1143 (9th Cir. 2011) ......................................... 24, 26

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993) .................................................................. 49

*Coffin v. United States*,
   156 U.S. 432 (1895) .................................................................. 3

*Conner v. Heiman*,
   672 F.3d 1126 (9th Cir. 2012) ............................................... 23

*Dalehite v. United States*,
   346 U.S. 15 (1953) .................................................................. 45

*Design Data Corp. v. Unigate Enters., Inc.*,
   847 F.3d 1169 (9th Cir. 2017) ............................................... 23

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ........................................................... 7, 62

*Duarte v. City of Stockton*,
   60 F.4th 566 (9th Cir. 2023) .................................................. 31

*Eldridge v. Block*,
    832 F.2d 1132 (9th Cir. 1987) ................................................................ 24

*Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*,
    764 F.2d 619 (9th Cir. 1985) ................................................................ 29

*Ex parte Pa.*,
    109 U.S. 174 (1883) ................................................................ 64

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................ 20, 26

*Green v. Thomas*,
    No. 3:23-CV-126-CWR-ASH (S.D. Miss. May 20, 2024) .............. 5, 21, 65

*Griffin v. Cnty. Sch. Bd.*,
    377 U.S. 218 (1964) ................................................................ 26

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939) ................................................................ 52

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ................................................................ 29

*Hervey v. Estes*,
    65 F.3d 784 (9th Cir. 1995) ................................................................ 32

*Hisquierdo v. Hisquierdo*,
    439 U.S. 572 (1979) ................................................................ 49

*Hutto v. Davis*,
    454 U.S. 370 (1982) ................................................................ 55

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ................................................................ 8, 11

*Jimerson v. Lewis,*
    92 F.4th 277 (5th Cir. 2024)..................................................... 21

*Kalina v. Fletcher,*
    522 U.S. 118 (1997)............................................................. 10

*Keates v. Koile,*
    883 F.3d 1228 (9th Cir. 2018) .............................................. 31

*Keith v. Volpe,*
    858 F.2d 467 (9th Cir. 1988) .......................................... 23, 25

*Kendall v. United States,*
    37 U.S. 524 (1838)............................................................... 56

*Leadsinger, Inc. v. BMG Music Publ'g,*
    512 F.3d 522 (9th Cir. 2008) ................................................ 25

*Loving* v. *United States,*
    517 U.S. 748 (1996)............................................................. 60

*Lucas v. Dep't of Corr.,*
    66 F.3d 245 (9th Cir. 1995) ................................................. 25

*Mapp v. Ohio,*
    367 U.S. 643 (1961)...............................................................3

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803).......................................passim

*Martin v. City of Boise,*
    920 F.3d 584 (9th Cir. 2019) ............................................... 30

*Maxwell v. Moore,*
    63 U.S. (22 How.) 185 (1859) .............................................. 63

*McCray v. United States,*
  195 U.S. 27 (1904)................................................................ 58

*McKinney v. City of Middletown,*
  49 F.4th 730 (2d Cir. 2022) .............................................. 22

*Montz v. Pilgrim Films & Television, Inc.,*
  649 F.3d 975 (9th Cir. 2011) ............................................ 32

*Moore v. Kayport Package Express, Inc.,*
  885 F.2d 531 (9th Cir. 1989) ............................................ 26

*Moss v. U.S. Secret Serv.,*
  572 F.3d 962 (9th Cir. 2009) ............................................ 30

*Murrell v. W. Union Tel. Co.,*
  160 F.2d 787 (5th Cir. 1947) ............................................ 54

*N. Sec. Co. v. United States,*
  193 U.S. 197 (1904)........................................................... 63

*Nashville Milk Co. v. Carnation Co.,*
  355 U.S. 373 (1958)........................................................... 54

*Newport v. Fact Concerts,*
  453 U.S. 247 (1981)........................................................... 49

*Nguyen v. Endologix, Inc.,*
  962 F.3d 405 (9th Cir. 2020) ............................................ 23

*Nixon v. Administrator of General Services,*
  433 U.S. 425 (1977)........................................................... 58

*Noll v. Carlson,*
  809 F.2d 1446 (9th Cir. 1987) .......................................... 24

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016) ..................................................... 31

*Padilla v. Yoo,*
    678 F.3d 748 (9th Cir. 2012) ..................................................... 30

*Pierson v. Ray,*
    386 U.S. 547 (1967) .............................................. 5, 6, 44, 48

*Quinn v. Robinson,*
    783 F.2d 776 (9th Cir. 1986) ..................................................... 21

*Railway Co. v. Whitton's Adm'r,*
    80 U.S. 270 (1872) .................................................................... 63

*Robert C. Herd & Co., v. Krawill,*
    359 U.S. 297 (1959) ..................................................................9

*Roberts v. City of Fairbanks,*
    947 F.3d 1191 (9th Cir. 2020) ..................................................... 31

*Rogers v. Jarrett,*
    63 F.4th 971 (5th Cir. 2023) ..................................................... 22

*Scheuer* v. *Rhodes,*
    416 U.S. 232 (1974) ..................................................................... 11

*Screws v. United States,*
    325 U.S. 91 (1945) ...................................................................... 45

*Shomberg v. United States,*
    348 U.S. 540 (1955) .................................................................... 49

*Sinclair Refining Co. v. Atkinson,*
    370 U.S. 195 (1962) .................................................................... 63

*Singleton v. Wulff,*
  428 U.S. 106 (1976)............................................................ 21

*Sloan Shipyards Corp. v. U.S. Shipping Bd. Emergency Fleet Corp.,*
  258 U.S. 549 (1922)............................................................ 10

*Stephan v. United States,*
  319 U.S. 423 (1943)............................................................ 54

*Strother v. Lucas,*
  37 U.S. (12 Peters) 410 (1838) .............................................. 49

*Tenney v. Brandhove,*
  341 U.S. 367 (1951)......................................................... 8, 10

*United States ex rel. Turner v. Williams,*
  194 U.S. 279 (1904)............................................................ 55

*United States v. Lee,*
  106 U.S. 196 (1882)......................................................... 4, 12

*United States v. Olsen,*
  737 F.3d 625 (2013) ...........................................................7

*United States v. Schooner Peggy,*
  5 U.S. (1 Cranch) 103 (1801) ................................................ 58

*United States v. Stanley,*
  109 U.S. 3 (1883)............................................................. 50

*United States v. Union Pac. R.R.,*
  98 U.S. 569 (1878)............................................................ 63

*United States v. Webb,*
  655 F.2d 977 (9th Cir. 1981) ............................................ 24, 25

*United States v. Welden,*
377 U.S. 95 (1964)........................................................................ 52, 54

*Vidal v. Philadelphia,*
43 U.S. (2 How.) 127 (1844) ....................................................... 49

*Wayman v. Southard,*
23 U.S. 1 (1825)............................................................................ 63

*Wellness Int'l Network, Ltd. v. Sharif,*
575 U.S. 665 (2015)...................................................................... 60

*Wheaton v. Peters,*
33 U.S. (8 Pet.) 591 (1834)......................................................... 50

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,*
668 F.2d 1014 (9th Cir. 1982) .................................................... 25

*Williams v. Vannoy,*
No. 21-00139-BAJ-EWD (M.D. La. Dec. 19, 2023)................. 22

*Youakim v. Miller,*
425 U.S. 231 (1976)...................................................................... 21

**STATE CASES**

*In re Rabin,*
No. 1 CA-CV 22-0359 FC (Ct. App. May 16, 2023) ................. 17

**CONSTITUTIONAL PROVISIONS**

U.S. CONST., art. III........................................................................ 62

U.S. CONST., art. VI................................................................ 56, 59, 61

## STATUTES

1 U.S.C. § 204 ................................................................. 54

28 U.S.C. § 1652 ............................................................ 65

28 U.S.C. § 453 .............................................................. 60

8 U.S.C. § 43 (1925)....................................................... 53

A.R.S. § 13-1302 ............................................................ 16

A.R.S. § 13-2923 ............................................................ 15

## RULES

9th Cir. R. 28-1 ............................................................. 15

Ariz. R. Crim. P. 15.1 .................................................... 18

Ariz. R. Crim. P. 15.8 .................................................... 18

## LEGISLATIVE MATERIALS

Act of June 30, 1926,
    Ch. 712, 44 Stat. 1, § 2.............................................. 53

Civil Rights Act of 1866,
    Ch. 31, § 1, 14 Stat. 27............................................. 38

Civil Rights Act of 1871, § 1, 17 Stat. ......................... 48

CONG. GLOBE,
    39th Cong., 1st Sess. (1866) ...................................... 39

CONG. GLOBE,
   42nd Cong., 1st Sess. (1871) .................................................... 35, 45, 46, 47

CONG. GLOBE,
   42nd Cong., 3rd Sess. ................................................................. 50

CONG. GLOBE,
   43rd Cong., 1st Sess. ................................................................. 51

H.R. Rep No. 39-30 (1866) ................................................................ 35

H.R. Rep No. 42-22 (1872) ................................................................ 37

Ku Klux Klan Act of 1871,
   Ch. 22, § 3, 17 Stat. 13, 14 ....................................................... 43

*Memphis Riots and Massacres,*
   H.R. Rep No. 39-101 (1866) ...................................................... 35

Senate Vote #94 in 1866 (39th Congress) ......................................... 42

## OTHER AUTHORITIES

Alexander A. Reinert,
   *Qualified Immunity's Flawed Foundation,*
   111 CAL. L. REV. 201 (2023) .................................................... 51

Andrew Wimer,
   *Massive New Study Reveals That Qualified Immunity Is About*
   *More Than Police Misconduct,* INST. FOR JUSTICE (Feb. 7, 2024) ........... 13

Brandon L. Garrett et. al.,
   *The Brady Database* (forthcoming),
   J. OF CRIM. L. AND CRIMINOLOGY ........................................... 7, 8

Brandon L. Garrett,
   *Judging Innocence,* 108 COLUM. L. REV. 55 (2008) ..................................7

Constitution Annotated,
   *President Andrew Johnson and Impeachable Offenses* .......................... 39

Daniel Byman,
   *White Supremacy, Terrorism, and the Failure of Reconstruction in the
   United States,* 46 INT'L SECURITY 53 (2021) ............................................... 36

Equal Justice Initiative,
   *Reconstruction in America: Racial Violence After the Civil War,
   1865-1876* (2020) .................................................................................passim

Fred C. Zacharias,
   *The Professional Discipline of Prosecutors,*
   79 N.C. L. REV. 721 (2001) .........................................................................8

Gary Lawson,
   *The Constitutional Case Against Precedent,*
   17 HARV. J.L. & PUB. POL'Y 23 (1994)........................................................ 62

*Historical Highlights: The Civil Rights Bill of 1866,*
   U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES ....................... 39

*Historical Highlights: The Ku Klux Klan Act of 1871,*
   U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES. ....................... 43

HUMAN RIGHTS WATCH,
   *Caste Violence Against India's "Untouchables"* (1999)............................5

Jay Schweikert,
   *Qualified Immunity: A Legal, Practical, and Moral Failure,*
   CATO INST. (Sept. 14, 2020) ...................................................................... 65

Kat Eschner,
   *This Supreme Court Justice Was a KKK Member,*
   SMITHSONIAN MAGAZINE (Feb. 27, 2017) ....................................................5

*Ku Klux Outrages,*
    THE WEEKLY STANDARD (Oct. 5, 1870) .................................................... 36

Matthew S. Nichols,
    *No One Can Serve Two Masters: Arguments Against Private Prosecutors,*
    13 CAP. DEF. J. 279 (2001) ....................................................................... 10

Michael S. Paulsen,
    *The Irrepressible Myth of Marbury,* 101 MICH. L. REV. 2706 (2003) ......... 56

*President Grant Takes on the Ku Klux Klan,*
    NAT'L PARK SERV ...................................................................................... 43

Ralph H. Dwan et al.,
    *The Federal Statutes–Their History and Use,*
    22 MINN. L. REV. 1008 (1938) ....................................................... 50, 52, 53

*The Kuklux Organization—Its Purposes and its Numerous Deeds of
    Violence,* THE DAILY STANDARD (May 27, 1870) ...................................... 36

Tiffany R. Wright et al.,
    *Truth and Reconciliation: The Ku Klux Klan Hearings of 1871
    and the Genesis of Section 1983,* 126 DICK. L. REV. 685 (2022) 34, 35, 36, 37

*What is India's caste system?*
    BBC NEWS (June 19, 2019) ..........................................................................4

## DEDICATION

This brief is dedicated to the memory of the thousands of Black Americans who were robbed, beaten, tortured, raped, and murdered in the years following the Civil War. Their horrific ordeals, often at the hands of local law enforcement and members of the state judiciary, compelled Congress to enact the Civil Rights Acts of 1866 and 1871, which ultimately gave rise to Section 1983.

## FOREWORD

This case details the corrupt and unlawful actions inflicted on me by agents of the State of Arizona, acting under color of law. Because the narrative is presented by me and not through counsel, this brief is written from a first-person perspective.

I ask this Court to please bear in mind that I am not a lawyer and I have no formal legal education or training. What I do have is a Lexis account gifted to me by an attorney friend, and a passion for justice. And autism. That said, I certify that no part of this brief was AI-generated and that the only assistance I received here consisted of formatting and stylistic suggestions offered by my #LawTwitter attorney friends. I did not receive any legal advice from anyone on this brief.

Considering these factors, I respectfully ask this Court to *liberally* construe this brief to the fullest extent permissible. The Constitution, and indeed justice itself, need all the support we can muster right now.

# INTRODUCTION

> Some people wake up and choose violence, I wake up and choose citations.[1]

The Framers drafted the Constitution to ensure government accountability. Chief Justice Marshall recognized this principle in *Marbury v. Madison* when he noted that the fundamental purpose of the Constitution is to restrain the actions of government and its officers.[2] Simply put, the government must answer for its actions—the "very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."[3]

Less than 150 years ago, it was "the undoubted law, axiomatic and elementary"[4] that no man in this country "is so high that he is above the

---

[1] @GalvanAmanza, X (formerly Twitter) (Apr. 21, 2024). This quote succinctly and precisely summarizes my entire basis for this action.

Also, clickable hyperlinks are embedded throughout this brief. They are identifiable by this color.

[2] 5 U.S. (1 Cranch) 137, 176 (1803).

[3] *Id.* at 163. *See Mapp v. Ohio,* 367 U.S. 643, 670 (1961) (Douglas, J., concurring) (observing that a constitutional right without a remedy "might as well be stricken from the Constitution.").

[4] To borrow a few words of the Supreme Court from this period. *See Coffin v. United States*, 156 U.S. 432, 453 (1895).

law,"[5] and "no officer of the law may set that law at defiance with impunity."[6] Likewise, it was beyond question or debate that "[a]ll the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it,"[7] especially "every man who by accepting office participates in its functions."[8] After all, we are "a government of laws, and not of men."[9] Or at least we *were.*

Today, Marshall's words seem to ring hollow. The "settled and invariable principle" of the common law "that every right, when withheld, must have a remedy, and every injury its proper redress,"[10] has largely vanished. Instead, we now have something resembling a caste system, where state officials are akin to Kshatriyas,[11] while the rest of us are

---

[5] *United States v. Lee*, 106 U.S. 196, 220 (1882).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Marbury,* 5 U.S. (1 Cranch) at 163.

[10] *Id.*

[11] The "warriors and rulers." *See What is India's caste system?* BBC NEWS (June 19, 2019).

treated as Dalits.[12] Created by the Supreme Court in 1967, this pseudo caste system even has a name: qualified immunity.[13]

## I.   *Pierson v. Ray:* The Creation of Qualified Immunity

In 1967,[14] the Supreme Court held that judges have absolute immunity to suits under § 1983.[15] This holding was based primarily on the Court's *plainly* false assertion that § 1983's "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities."[16] The Court was only able to reach this decision by ignoring

---

[12] "Untouchables"—the lowest class and subject to human rights abuses committed by government officials and largely with impunity. *See* HUMAN RIGHTS WATCH, *BROKEN PEOPLE: Caste Violence Against India's "Untouchables"* 23, 32 (1999) (describing the "impunity" of police and government officials who violate the rights of Dalits, ostensibly "protected" under India's constitution).

[13] Unless otherwise specified, the term "qualified immunity" as used in this brief refers generally to any Supreme Court-created immunity under 42 U.S.C. § 1983.

[14] I concur with the Honorable Carlton Reeves' recent observation that "[i]t is difficult to see qualified immunity's creation as anything other than a backlash to the Civil Rights Movement." *Green v. Thomas,* No. 3:23-CV-126-CWR-ASH, 2024 U.S. Dist. LEXIS 90805, at *14 (S.D. Miss. May 20, 2024). The presence on the *Pierson* Court of a former Ku Klux Klan member should certainly not be ignored in this context. *See* Kat Eschner, *This Supreme Court Justice Was a KKK Member,* SMITHSONIAN MAGAZINE (Feb. 27, 2017).

[15] *Pierson v. Ray*, 386 U.S. 547 (1967).

[16] *Id.* at 554.

Justice Douglas' well-crafted dissent, in which he pointed out that the majority's "position that Congress did not intend to change the common-law rule of judicial immunity ignores the fact that *every member of Congress who spoke to the issue assumed that the words of the statute meant what they said and that judges would be liable*."[17] In fact and as stated by Douglas, "[m]any members of Congress objected to the statute because it imposed liability on members of the judiciary."[18]

In *Pierson*, the Court also held—based on what could only *generously* be described as a "misunderstanding" of both the common law and the Supremacy Clause—that police officers are entitled to immunity for their violations of constitutional rights committed in "good faith." But "lawsuits against officials for constitutional violations did not generally permit a good-faith defense during the early years of the Republic" or in the decades after § 1983 was enacted by Congress.[19] Moreover, "to the limited extent a good-faith defense did exist in some common-law suits, it

---

[17] *Id.* at 561 (emphasis added).

[18] *Id.* at 561-62.

[19] *See* William Baude, *Is Qualified Immunity Unlawful?,* 106 CAL. L. REV. 45, 55, 57 (2018).

was part of the elements of a common-law tort, not a general immunity."[20]

The Court therefore "either ignored or misstated this history."[21]

## II. *Imbler v. Pachtman:* Subsidizing Public Corruption

Brady violations have been described as an "epidemic" in this country.[22] In a recent study of more than 800 state and federal cases from 2014 through 2019, *Brady* violations were identified by *courts* in 10% of these.[23] Such violations are, of course, a key factor in wrongful convictions.[24] An examination of 200 DNA exonerations found that the prosecution withheld exculpatory evidence in 36% of cases.[25] This is exactly what happened in my case.[26]

---

[20] *Id.* at 55.

[21] *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 241 (2022).

[22] *United States v. Olsen,* 737 F.3d 625, 626 (2013) (Kozinski, C.J., dissenting).

[23] *See* Brandon L. Garrett et. al., *The Brady Database*, J. OF CRIM. L. AND CRIMINOLOGY (forthcoming) at 6.

[24] *See* Jon B. Gould et al., *Mapping the Path of Brady Violations: Typologies, Causes & Consequences in Erroneous Conviction Cases,* 71 SYRACUSE L. REV. 1061, 1070 (2021).

[25] *See* Brandon L. Garrett, *Judging Innocence,* 108 COLUM. L. REV. 55, 119 (2008)

[26] *See infra* pp. 15-18.

7

Nevertheless, prosecutors who commit Brady violations almost never face discipline by the Bar.[27] In one recent study, out of 82 cases where courts found that a prosecutor had committed a *Brady* violation, *not one* was referred to the Bar for professional discipline.[28] This is in spite of the fact that nearly 40% of *Brady* violations are *intentional*.[29]

Undoubtedly, the Supreme Court shares some degree of culpability in the spread of this epidemic. In *Imbler v. Pactman*, the Court held that state prosecutors were absolutely immune under § 1983.[30] This decision relied on three asserted elements: **(1)** *Pierson's* holding that the common-law absolute immunity of judges for acts committed within their judicial jurisdiction was found to be preserved under § 1983;[31] **(2)** *Tenney v. Brandhove,[32]* which the Court claimed had "established that § 1983 is to be read in harmony with general principles of tort immunities and

---

[27] *See* Fred C. Zacharias, *The Professional Discipline of Prosecutors,* 79 N.C. L. Rev. 721, 754 (2001) (discipline when prosecutorial misconduct occurs is "quite rare.").

[28] *See* Garrett, et al., *supra* note 23 at 44.

[29] *Id.* at 6. *See* Gould et al., *supra* note 24 at 1065.

[30] 424 U.S. 409, 424 (1976).

[31] *Id.* at 418.

[32] 341 U.S. 367 (1951).

defenses rather than in derogation of them";[33] and **(3)** that public policy considerations dictate "the same absolute immunity under [§ 1983] that a prosecutor enjoys at common law."[34] In fact none of these support *Imbler's* holding.

First, as already discussed, *Pierson's* absolute immunity holding was premised on a gross misstatement—inadvertent or otherwise—regarding the legislative record of § 1983. Second, it is wholly disingenuous to assert that *Tenney v. Brandhove* requires § 1983 "be read in harmony with general principles of tort immunities and defenses rather than in derogation of them"[35] given that *Tenney* concerned a § 1983 suit against members of California's Senate and where immunity was not based on the

---

[33] *Imbler,* 424 U.S. at 418.

[34] *Id.* at 427.

[35] *Id.* at 418.

The Court also misrepresented the effect of the Derogation Canon, which exists *to prevent the limitation of liability* or the foreclosure of claims. To this end, "any such rule of law, being in derogation of the common law is "not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding" *Robert C. Herd & Co., v. Krawill,* 359 U.S. 297, 305-06 (1959). *See* Reinert, *infra* note 121 at 222 (observing that "from the outset, the [Supreme] Court used the canon to amplify common law claims, not common law defenses.").

common law, but rather legislative acts. In finding such immunity, *Tenney* relied on: **(1)** the speech and debate clause of the 1689 English Bill of Rights;[36] and **(2)** Article I, § 6, of the Constitution.[37] Neither the word "tort," nor a discussion of immunities and liabilities thereunder,[38] is anywhere to be found in *Tenney*. <u>Third</u>, there was never any absolute immunity afforded to prosecutors at common law because *public prosecutors did not even exist until eight years after § 1983 was enacted*.[39]

---

[36] *Tenney,* 341 U.S. at 372.

[37] *Id.*

[38] *Imbler* also ignored the well-settled "general rule … that any person within the jurisdiction always is amenable to the law," including agents of the federal government. *Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp.,* 258 U.S. 549, 566-67 (1922) (agent of the United States "does not cease to be answerable for his acts" absent "a constitutional rule of law that exonerates him.").

[39] *See* Matthew S. Nichols, *No One Can Serve Two Masters: Arguments Against Private Prosecutors,* 13 CAP. DEF. J. 279, 285 (2001) ("The notion of a public prosecutor did not emerge in England until the Prosecution of Offenses Act of 1879 established the Office of Director of Public Prosecutions." (citation omitted)), *accord Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring) ("There was, of course, no such thing as absolute prosecutorial immunity when § 1983 was enacted because "there generally was no such thing as the modern public prosecutor.").

*Imbler* concluded by conceding that "such immunity leaves the genuinely wronged criminal defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,"[40] which it "justified" because "[t]he ultimate fairness of the operation of the system itself *could be* weakened by subjecting prosecutors to § 1983 liability."[41] So, at its core, *Imbler* relies on nothing more than conjecture to "justify" its radical departure from *Marbury's* clear statement that there is no right without a remedy.[42]

### III.  Section 1983 Immunity Today

This Court is well aware of the present state of qualified immunity. And because it is my contention—as discussed later in this brief—that such immunity is unlawful and unconstitutional, I will devote none of the limited space I have here to a discussion of the byzantine labyrinth plaintiffs now must navigate in order to maintain a § 1983 claim. Suffice

---

[40] *Imbler,* 424 U.S. at 410.

[41] *Id.* at 427.

[42] *Imbler* reached an absurd conclusion: state prosecutors, who are themselves executive branch officers, are *even more important* than their state's chief executive—the governor. *See, e.g., Scheuer* v. *Rhodes*, 416 U.S. 232 (1974) (unanimously holding state governor was entitled only to qualified immunity).

11

it to say that if the Supreme Court's initial § 1983 immunity decisions were dead wrong, then it follows that all of its subsequent decisions—building on these—were likewise in error.

## IV. Conclusion

"[A] government which has a just claim to well-regulated liberty and the protection of personal rights"[43] understands that where the rights of the citizen "have been brought in collision with the acts of the government … there is no safety for the citizen, except in the protection of the judicial tribunals."[44] For this reason, its "[c]ourts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government[.]"[45] But beginning in 1967, our right to seek relief for constitutional violations committed against us by state officials—guaranteed under 42 U.S.C. § 1983 and protected against infringement

---

[43] *Lee*, 106 U.S. at 221.

[44] *Id.* at 219.

[45] *Id.* at 220.

under the First[46] and Fourteenth Amendments[47]—has been gradually, profoundly, and unconstitutionally narrowed by the founding documents of an *ad hoc* caste system: *Pierson v. Ray and Imbler v. Pachtman.*

Today in America, as has been the case in India for centuries, state officials who commit constitutional torts are largely above the law,[48] protected by "binding" Supreme Court precedent that stands unabashedly in defiance of the most basic principle upon which this country was founded: Accountability of government to its people. This appeal seeks to vindicate this principle, and to reestablish the Supremacy Clause of the Constitution. Because—as it stands today—this clause is wholly subservient to judicial fiat.

---

[46] *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002) (the right to petition the government for a redress of grievances is "one of the most precious of the liberties safeguarded by the Bill of Rights").

[47] *Christopher v. Harbury,* 536 U.S. 403, 415 n.12 (2002) (the right of access to the courts is protected under the Privileges and Immunities clause).

[48] *See* Andrew Wimer, *Massive New Study Reveals That Qualified Immunity Is About More Than Police Misconduct,* INST. FOR JUSTICE (Feb. 7, 2024) (overall, qualified immunity is denied by federal appellate courts just 26% of the time).

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over my § 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343. Final judgment was entered in this case by the district court on <u>April 17, 2024</u> by way of dismissal under Rule 12. The Notice of Appeal was timely filed that same day, Fed. R. App. P. 4(a)(1)(A), and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# ISSUES PRESENTED

I. Whether the district court incorrectly applied the *Heck* bar when it found a dismissed criminal charge barred suit under Section 1983.

II. Whether the court's grant of qualified immunity was legally sufficient given its single-sentence analysis.

III. Whether the court abused its discretion when it dismissed the action without considering Appellant's motion for leave to amend.

IV. Whether immunity under Section 1983 is unconstitutional.

V. Whether the Supreme Court's Section 1983 immunity precedent is truly "binding" on lower federal courts.

## STATEMENT OF THE CASE

This case essentially boils down to one question: Is clearly erroneous Supreme Court precedent a higher authority than the Constitution?

### I.    Factual Background[49]

On <u>March 30, 2022</u>, I pleaded guilty to two crimes: **(1)** attempted stalking; and **(2)** custodial interference. (Doc. 44-5). Under the plain language of these statutes the conduct charged was not a crime—I knew this when I pleaded guilty.

Briefly, the attempted stalking conviction was based on my placement of a GPS device in my son's teddy bear (Doc. 44-3 at 6)—conduct which is expressly lawful in Arizona.[50] The conviction for custodial interference was based on my four-day refusal to return my son, S.M., to

---

[49] To give proper treatment to the background facts relevant to this appeal would require me to exceed my allotted 14,000 words. So, to the extent that it is permissible under Circuit Rules, I refer this Court to Doc. 44-3 and 98-1, filed as exhibits in the district court, should this Court desire a more detailed factual background. *See, e.g.* 9th Cir. R. 28-1(b) ("Parties must not … incorporate by reference *briefs* submitted to the district court … or refer this Court to such *briefs* for the *arguments on the merits* of the appeal.") (emphases added).

[50] *See* A.R.S. § 13-2923(D)(1)(b) (stalking "course of conduct" does not include the use of a GPS device by a parent to keep track of his or her minor child).

Appellee Rabin,[51] after S.M. told me that Ms. Rabin's boyfriend had physically abused him (Doc. 44-3 at 7-9) and the police refused to investigate this after I reported it. (Doc. 98-1, ¶¶ 77-83).[52] My conduct here was also expressly lawful in Arizona.[53]

Why, then, did I plead guilty if I knew I was innocent? The unfortunate answer is this: I did so because the prosecutor assigned to my case—Coconino County Chief Deputy Attorney, Ammon Barker— deliberately withheld exculpatory evidence.[54] (Doc. 44-3 at 2-3; Doc. 98-1, ¶¶ 128-131). These materials were audio and video recordings containing statements made by Ms. Rabin (Doc. 98-1, ¶¶ 128-131), and records from the Arizona Department of Child Safety ("DCS") (Doc. 98-1, ¶¶ 107-08).

---

[51] Ms. Rabin is my ex-wife and the mother of my son.

[52] The case was closed as "unfounded" on the day I made the report after the "investigating" officer called Ms. Rabin, who stated that S.M. had "fallen." This was the full extent of the child abuse "investigation." (Doc. 98-1, ¶¶ 79-80).

[53] *See* A.R.S. § 13-1302(D) (it is not custodial interference where a parent with joint legal custody withholds custody from the other parent where a parent: **(1)** has filed an emergency custody petition with the superior court and has received a hearing date from the court; and **(2)** has a good faith and reasonable belief that the child will be in immediate danger if the child is left with the other parent). I met both criteria.

[54] This evidence was not merely exculpatory, it was <u>proof of my innocence</u>.

16

The audio and video recordings plainly showed a conspiracy between Ms. Rabin and Appellee Ryan Forsman—the detective assigned to the case—to wrongfully charge me with stalking. (Doc. 98-1, ¶¶ 73-74; Doc. 44-3 at 16-17). Based on Ms. Rabin's statements to Mr. Forsman and others, the ultimate purpose of this conspiracy was apparently to ensure that Ms. Rabin would win sole custody at our upcoming family court trial. (Doc. 1-4, ¶ 151 at 123).[55] The audio and video recordings show moreover that other Flagstaff Police Department officers knew and understood that I had not committed stalking and in fact no crime had been committed. (Doc. 1-4, ¶¶ 26-27 at 95-96; Doc. 19-6). Moreover, the DCS records showed that—two years prior to my arrest—a substantiated finding of neglect had been entered against Ms. Rabin as to S.M. after he was nearly killed while in her custody. (Doc. 1-4, ¶¶ 14-15 at 93). Obviously, this was relevant as to my custodial interference charge. (Doc. 44-3 at 3).

---

[55] Ms. Rabin indeed later won sole custody on the basis of these bogus convictions, but the judgment was later reversed after I appealed. *See In re Rabin*, No. 1 CA-CV 22-0359 FC, 2023 Ariz. App. Unpub. LEXIS 465 (Ct. App. May 16, 2023).

Further, under two separate provisions of Arizona law disclosure of these materials *on a specific deadline* was required.[56] This is not even to mention *Brady*. Moreover, Mr. Barker repeatedly lied about the existence of these materials in his disclosure statements filed with the superior court. (Doc. 44-3 at 2-3; Doc. 98-1, ¶¶ 128-131). In fact, it would not be until 538 days *after I was convicted* that these materials would finally be disclosed to me. (Doc. 22-7). Even then, it took a court order to do so.[57] (Doc. 22-7).

Without these materials I had nothing by which to assert my innocence. It was my word against a veteran detective's. So, I ask: What is the point of going to trial when you have no possibility of winning, and where losing means the termination of your parental rights? Innocent or not, only a *stupid* person would do this.

---

[56] *See* Ariz. R. Crim. P. 15.1(b)(1), (c) (state "must" disclose witness statements no later than 30 days after arraignment); Ariz. R. Crim. P. 15.8(a) (state "must" disclose these at the time it extends a plea offer).

[57] The prosecutor's office never denied it had withheld these from me.

## II.  Procedural History

On <u>June 11, 2023</u>, I sought damages against Mr. Forsman and Ms. Rabin under 42 U.S.C. § 1983[58] in the Coconino Superior Court. (Doc. 1-4, pp. 90-128). The pleading ("FAC") made clear that the § 1983 claims were based on the stalking charge that had been dismissed pursuant to the plea agreement. (Doc. 1-4, ¶ 139 at 121). Thereafter, the case was removed to federal court, (Doc. 1), where extensive litigation—consisting of nearly 100 separate filings by the parties—ensued thereafter.

On <u>December 24, 2023</u>, counsel for Mr. Forsman filed a motion to dismiss the FAC, citing, among other grounds, that he was entitled to qualified immunity. (Doc. 20 at 12-15). And on <u>March 14, 2024</u>—prior to the court deciding the pending dismissal motion—I filed a motion for leave to file an amended and supplemental complaint to add claims that had accrued since the FAC was filed and to hold Mr. Barker accountable under § 1983 for his deliberate malfeasance (Doc. 75). Thereafter, Mr. Forsman filed his response, (Doc. 84), and I filed my reply, (Doc. 86).

---

[58] Ms. Rabin was alleged to be a private party state actor. (Doc. 1-4, ¶ 150 at 122).

On <u>April 17, 2024</u>, the district court dismissed the action in its entirety: **(1)** severing and remanding the state law claims, and **(2)** dismissing the § 1983 claims as barred under the *Heck* doctrine and on qualified immunity grounds as to Mr. Forsman. (Doc. 102).

This appeal concerns only the § 1983 claims, the dismissal of which I argue was without any legal basis.

## SUMMARY OF THE ARGUMENT

The district court's dismissal of my case—without considering any of the novel legal arguments raised in seeking leave to amend and supplement the complaint—was an abuse of discretion. Not only did the district court fail to make any findings as to futility of amendment, *Foman v. Davis*, 371 U.S. 178, 182 (1962), but it also made no findings on whether any party would be prejudiced by the proposed filing, *id.* Further, in dismissing the § 1983 claims, the district court erroneously applied the *Heck* bar to a nonexistent conviction. It moreover granted qualified immunity without any legal analysis.

Reversal is called for here. However, I respectfully ask the Court to do something first: abolish qualified immunity in this Circuit.

I. **This Court should decide the qualified immunity argument left unaddressed by the district court.**

While it is a general rule that "a federal appellate court does not consider an issue not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), this rule is not inflexible, *Youakim v. Miller*, 425 U.S. 231, 234 (1976). That said, my § 1983 immunity argument may properly be addressed by this Court because it is a purely legal question, and the record has been fully developed. *Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir. 1986).

Further, resolution of the issue is clear, *see id.*, because either the notwithstanding clause is still operative and therefore bars § 1983 immunity, or it is not, and does not. On the other hand, should this Court decline to exercise its discretion to address this issue—one having undeniable landmark potential—then it simply closes its eyes to the growing revolution taking place right now in other federal circuits.[59]

---

[59] *See, e.g., Green,* No. 3:23-CV-126-CWR-ASH at *3 (S.D. Miss. May 20, 2024) (Reeves, J.) (observing that "qualified immunity has no basis in law… [and] is an extra-constitutional affront to other cherished values of our democracy" and implying that he will no longer be granting qualified immunity in § 1983 cases); *Jimerson v. Lewis*, 92 F.4th 277, 284 n.1 (5th Cir. 2024) (Dennis, J., dissenting) (citing Alexander A. Reinert, *Qualified*

Bearing all this in mind, prior to reversing and remanding this Court should address the "game changing argument" about § 1983 immunity I raised. *See Rogers,* 63 F.4th at 980 (explaining that qualified immunity "brazenly contradicts" the notwithstanding clause of § 1983 and referring to this argument as "game changing"). This issue is too important to just sit on and wait for the next go-round.[60]

---

*Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 207-08 (2023)); *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring) ("[T]he Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language.*" (emphasis in original)); *Williams v. Vannoy*, No. 21-00139-BAJ-EWD, 2023 U.S. Dist. LEXIS 225530, at *9 n.3 (M.D. La. Dec. 19, 2023) (observing that "[s]cholars and at least one jurist of the U.S. Court of Appeals for the Fifth Circuit have recently called for its ouster because the doctrine is founded on a legal fiction derived from a reconstruction era scrivener's error that removed a determinative 16-word clause from the published version of 42 U.S.C. § 1983"); *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) ("[T]he doctrine of qualified immunity misbegotten and misguided—should go.").

[60] The notwithstanding clause has never been "squarely addressed" in any supreme court decision. *Brecht v. Abrahamson,* 507 U.S. 619, 631 (1993) (*stare decisis* does not bind courts unless the precedent "squarely addressed the issue" at hand).

## STANDARD OF REVIEW

Dismissal under Rule 12(b) and the question of amendment futility are reviewed *de novo. Hartmann v. Cal. Dep't of Corr. and Rehab.,* 707 F.3d 1114, 1122 (9th Cir. 2013) (dismissal); *Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 893 (9th Cir. 2010) (futility). A district court's grant of qualified immunity is also reviewed *de novo, Conner v. Heiman*, 672 F.3d 1126, 1130 (9th Cir. 2012), as is the conclusion that an action is *Heck-*barred, *Beets v. County of Los Angeles*, 669 F.3d 1038, 1041 (9th Cir. 2012).

Denial of leave to file an amended or supplemental pleading is reviewed for abuse of discretion. *Design Data Corp. v. Unigate Enters., Inc.*, 847 F.3d 1169, 1172 (9th Cir. 2017) (amended); *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988) (supplemental).

## ARGUMENT

I. **The district court erred in dismissing the Section 1983 claims.**

   A. **Dismissal without leave to amend and without considering Appellant's pending motion was an abuse of discretion.**

Courts have broad discretion to grant leave to amend a complaint. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020). But "[a] motion to amend under Rule 15(a)(2) generally shall be denied only upon showing of bad faith, undue delay, futility, or undue prejudice to the

opposing party." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1152 (9th Cir. 2011) (the crucial factor in granting or denying leave to amend is prejudice to the opposing party).

In all other cases, "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality,'" *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (citation omitted), and "even more liberally to pro se litigants," *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987), who must be afforded "an opportunity to amend the complaint to overcome deficiencies unless it is clear that they cannot be overcome by amendment," *id.* at 1135-36 (citing *Armstrong v. Rushing*, 352 F.2d 836, 837 (9th Cir. 1965)).

Prior to dismissal, a pro se litigant should be "provide[d] … with notice of the deficiencies in his or her complaint" to ensure that the litigant uses the opportunity to amend effectively. *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987). And while a statement of deficiencies "need not provide great detail or require district courts to act as legal advisors to pro se plaintiffs, district courts must at least draft a few sentences explaining the deficiencies." *Eldridge,* 832 F.2d at 1136 (citing *Noll*, 809 F.2d at 1448-49 (pro se litigant is entitled to procedural

protections, including right to amend complaint unless futile)); *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995) ("Unless it is absolutely clear that no amendment can cure the defect … a pro se litigant is entitled to notice of the complaint's deficiencies and an opportunity to amend prior to dismissal of the action.").

Reversal is warranted where a court has denied leave to amend but failed to provide "some statement of reasons or findings of fact showing bad faith or prejudice," *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981), and "[a]n outright refusal to grant leave to amend without a justifying reason is … an abuse of discretion," *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citation omitted).

Similarly, Rule 15(d) "is intended to give district courts broad discretion in allowing supplemental pleadings," *Keith,* 858 F.2d at 473 (citation omitted), in order "to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed," *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1057 (9th Cir. 1982). New claims, new parties, and events occurring after the original action are all properly permitted under Rule 15(d) because this

is "well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice." *Griffin v. Cnty. Sch. Bd.*, 377 U.S. 218, 227 (1964).

Thus, absent one of the factors favoring denial of leave to amend under Rule 15(a)(2), *see Chudacoff*, 649 F.3d at 1152, it is an abuse of discretion for a district court to refuse to grant leave to supplement a complaint, *Foman*, 371 U.S. at 182. *See also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989). On three separate grounds the district court's dismissal without leave was erroneous.

First, the district court—without considering any of the arguments I raised in support of leave to file the proposed amended and supplemental complaint *and* without any discussion of the Rule 15 factors for determining whether such leave should be granted—denied leave as moot "[b]ecause the Court must abstain from or dismiss all of Plaintiff's claims[.]" (Doc. 102 at 23). But this explanation fails: it addresses neither futility of amendment nor prejudice to the opposing parties. It also ignores that my proposed pleading included two brand new causes of action: **(1)** a

RICO claim (Doc. 75-2, ¶¶ 225-45 at 61-64);[61] and **(2)** a claim for racketeering under Arizona law, (Doc. 75-2, ¶¶ 246-52 at 65).[62] Neither of these was even acknowledged by the court, let alone properly addressed under the Rule 15 standards discussed above.

Second, in dismissing the case and denying leave to file my proposed amended and supplemental complaint, the court sidestepped entirely my contention—raised in the proposed pleading and supported in briefing—that this Circuit's extrinsic fraud exception to *Rooker-Feldman* applies to my criminal convictions. (Doc. 75-2, ¶ 219 at 60; Doc. 86 at 2). Given that this was one of the reasons for dismissal proffered by the district court (Doc. 102 at 7), it is puzzling why the court saw fit to give exactly zero consideration to the more than four pages of argument I offered to show that *Rooker-Feldman* was inapplicable (Doc. 86 at 4-8).[63] The district court

---

[61] The RICO claims were directed against both state actor and private person defendants.

[62] These claims were directed against the same RICO defendants.

[63] I argued that because **(1)** this Circuit reads *Rooker-Feldman* not as a jurisdictional bar, but rather an application of res judicata, (Doc. 86 at 2); and **(2)** res judicata is an affirmative defense liable to waiver, (Doc. 86 at 4); and **(3)** plea agreements are contractual in nature and therefore subject to contract interpretation standards, (Doc. 86 at 5-8); therefore **(4)** the State of

in fact could only support dismissal on *Rooker-Feldman* grounds by ignoring this argument, because I did all that was needed to overcome *Roooker-Feldman* at the pleading stage: comply with Rule 8 in alleging that a judgment was obtained through extrinsic fraud. (Doc. 75-2, ¶ 218-19 at 60). *Kougasian v. TMSL, Inc.,* 359 F.3d 1136, 1141 (9th Cir. 2004) ("It has long been the law that a plaintiff in federal court can seek to set aside a state court judgment obtained through extrinsic fraud."). *See Barrow v. Hunton*, 99 U.S. (9 Otto) 80, 99 (1878). This argument also presented an issue of first impression.

Finally, my proposed pleading also presented numerous *other* issues of first impression, and moreover asserted entirely novel theories of liability, including: **(1)** whether Congress expressly abrogated common law immunity under § 1983, (Doc. 86 at 10-13); and **(2)** whether *Younger* abstention applies to post-conviction proceedings where the conviction is void as the product of extrinsic fraud due to the state's deliberate concealment of material required to be disclosed under a state criminal

_____

Arizona—according to the terms of the plea agreement and as interpreted under Arizona's ordinary rules of contract interpretation—had waived its opposition to any collateral attack on my convictions, which I alleged were obtained through the state's extrinsic fraud, (Doc. 86 at 8).

procedure rule which is stricter and significantly more comprehensive than *Brady*, (Doc. 86 at 2-4). Standing alone, the presence of these first impression issues *strongly* disfavored the court's disposition of this case. *See Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985) ("Court[s] should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts." (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 1969)) (internal quotation marks omitted).

And when all of this is considered in light of Rule 15's "extreme liberality" policy—*especially* given my pro se status—the court's dismissal goes from dubious to untenable.

## B.  The *Heck* bar was applied to a nonexistent conviction.

Claims under § 1983 must be dismissed if they would "necessarily require the plaintiff to prove the unlawfulness of his conviction." *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). Obviously, "[w]here there is no 'conviction or sentence' that may be undermined by a grant of relief to the

plaintiffs, the *Heck* doctrine has no application." *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019).

In this case, the district court applied *Heck* to the § 1983 claims. (Doc. 102 at 21).[64] This was done even though I made crystal clear that this charge had been dismissed (Doc. 1-4, pp. 121),[65] a fact the court was required to accept as true at the dismissal stage. *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012) (district court required to "accept as true" all well-pled allegations of material fact and construe them "in the light most favorable" to the plaintiff). My assertion regarding the dismissal charge was *at least* "plausibly suggestive of a claim entitling [him] to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

Because "[t]he absence of a criminal judgment here renders the *Heck* bar inapplicable," *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1198 (9th

---

[64] "By 'the charge that was dismissed,' Plaintiff appears to mean the stalking charge that was subsequently reduced to attempted stalking pursuant to Plaintiff's plea agreement … Plaintiff must first obtain a favorable termination of his attempted stalking conviction before he may bring his § 1983 and § 1985 claims against Forsman and Rabin in Counts VIII–X, and XII."

[65] "[T]he stalking charge related to Rabin's February 11, 2021 report was dismissed pursuant to a plea agreement…"

Cir. 2020), the district court committed reversible error by dismissing the § 1983 counts on this basis, *Duarte v. City of Stockton*, 60 F.4th 566, 573 (9th Cir. 2023) (reversing district court's *Heck* dismissal where there was no conviction).

### C.  The qualified immunity analysis fails as a matter of law.

The entirety of the district court's qualified immunity "analysis" is a single sentence: "Defendant Forsman is entitled to qualified immunity on the constitutional claims against him." (Doc. 102 at 7). Here, the court made no attempt to "determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (dismissal inappropriate without this determination), Nor did it determine whether the factual allegations "support the claim that the officials' conduct violated clearly established constitutional rights." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).[66] But if a complaint "contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go

---

[66] The court in fact did not cite even one authority in support.

31

forward with their claims." *Id.* My pleading had this. (Doc. 1-4, ¶¶ 40-42 at 130-32).[67]

| | |
|---|---|
| 4 | **40.** On <u>June 7, 2021</u> Forsman applied for and was granted a search warrant |
| 5 | (SW202100176) by Division II of the Coconino Superior Court. |
| 6 | **41.** In his search warrant affidavit Forsman falsely alleged: **(1)** Rabin reported |
| 7 | finding a GPS tracker "*on* her vehicle"; **(2)** it "caused her to fear injury or death because |
| 8 | of past documented incidents with [Plaintiff]"; **(3)** and that Rabin stated that she and her |
| 9 | current boyfriend had been threatened in the past by [Plaintiff]." |
| 10 | **42.** These were knowingly false statements of a material nature which were |
| 11 | utilized by Forsman to unlawfully obtain a search warrant. These materially false |
| 12 | statements also constituted perjury by Forsman. |

Regardless, the district court's entirely bereft determination of this issue was wholly insufficient to "clearly show" that I "would be unable to overcome qualified immunity." *Chavez v. Robinson*, 817 F.3d 1162, 1169 (9th Cir. 2016). District courts are required to apply the law, not ignore it.

---

[67] I concede my failure to allege that "without the dishonestly included or omitted information[] the magistrate would not have issued the warrant." *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995). But leave should have been granted regardless. *See Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 984 n.3 (9th Cir. 2011). My small oversight does not in any manner rescue the court's defective qualified immunity determination.

**D.  Even if the court's dismissal on qualified immunity grounds was otherwise proper, such immunity lacks any basis in either history or law and violates the Supremacy Clause.**

The intent of Congress in enacting § 1983 was crystal clear: to provide a means to hold every single person accountable for constitutional torts committed under color of state law. What's more, this intent is expressed in the plain language of the law. And because the Supreme Court has no constitutional power to disregard a prima facie lawful exercise of Congress's power—under the Necessary and Proper Clause—qualified immunity violates the Supremacy Clause.

Any good faith analysis of the legislative history of § 1983 makes clear that Congress intended to foreclose all immunity to such suits, and Congress included such language when § 1983 was enacted. This language, which was shortly thereafter subject to an unauthorized removal, still controls. As such, the Supreme Court's creation of § 1983 immunity violates the Constitution.

1. **The historical and legislative background of Section 1983 clearly shows Congress's intent to foreclose immunity.**

   a. Reconstruction: Rainbows and Unicorns, It Was Not

The year 1865 marked the end of the Civil War and the beginning of the Reconstruction era, in which the federal government committed itself to rebuilding the South and integrating formerly enslaved Black Americans into society as fully equal citizens. Despite these efforts, white supremacist groups, especially the Ku Klux Klan (the "Klan"), formed with the principal goal of resisting Reconstruction policies. Using campaigns of terror and violence, Black Americans throughout the South faced lynchings, beatings, arson, and murder. From 1865 to 1875, close to 2,000 Black Americans were lynched.[68] The three-year period between 1872 and 1875 alone saw more than 34 mass killings targeting Black Americans and their white allies.[69]

---

[68] *See* Equal Justice Initiative, *Reconstruction in America: Racial Violence After the Civil War, 1865-1876,* at 44 (2020) [hereinafter EJI] ("In some cases, the estimated death tolls reached 100 or more victims.").

[69] Tiffany R. Wright et al., *Truth and Reconciliation: The Ku Klux Klan Hearings of 1871 and the Genesis of Section 1983,* 126 DICK. L. REV. 685, 699 (2022).

Law enforcement did little if anything to help. "No southern sheriff would arrest the hooded night riders who terrorized black citizens,"[70] and local police forces were often infiltrated by or actively collaborated with the Klan.[71] Those sworn to uphold the law and those engaging in terrorism were often the same,[72] and in many cases police officers were ringleaders of this terrorism.[73]

The judiciary in the South was also deeply antagonistic to the rights of newly freed Black Americans.[74] Judges and juries were overwhelmingly white and typically sympathetic to white supremacist views, and Black plaintiffs and defendants typically faced hostile courtrooms where their rights were routinely ignored or outright violated by southern judges.[75]

---

[70] *Id.* at 702.

[71] CONG. GLOBE, 42nd Cong., 1st Sess. App. 72 (1871) (Michigan Congressman Austin Blair observed, "[The Klan] are powerful enough to defy the state authorities. In many instances they are the State authorities.").

[72] *Id.* at 699-700.

[73] *Memphis Riots and Massacres,* H.R. Rep No. 39-101, at 25 (1866) [hereinafter *Memphis Massacres*].

[74] *See* EJI, *supra* note 68 at 44.

[75] H.R. Rep No. 39-30, pt. III, at 184 (1866).

Intimidation of witnesses[76] and jurors by white supremacist groups further corrupted the judicial process,[77] making prosecutions of whites for crimes against Black Americans exceedingly rare.[78] On the rare occasion that a case went to trial, white defendants were usually acquitted even with overwhelming evidence of their guilt.[79] When Black Americans attempted to vindicate their rights through civil proceedings, judges in the South retaliated against them:

---

[76] After Daniel Blue, a Black man, testified against Klan members who burned down a friend's home, a mob of Klansmen retaliated by breaking into his house. Once inside, they murdered his pregnant wife and all five of his children. One Klansman later bragged about killing the last child by "kicking its brains out with the heel of his boot." EJI, *supra* note 68 at 72 (quoting *The Kuklux Organization—Its Purposes and its Numerous Deeds of Violence,* THE DAILY STANDARD (Raleigh, N.C.) (May 27, 1870)). *See also Ku Klux Outrages,* THE WEEKLY STANDARD (Oct. 5, 1870) (describing the murders).

I included this horrific account because § 1983 "cannot be understood in a historical vacuum." *Briscoe* v. *LaHue*, 460 U.S. 325, 330 (1983).

[77] *See* Daniel Byman, *White Supremacy, Terrorism, and the Failure of Reconstruction in the United States,* 46 INT'L SECURITY 53, 78 (2021).

[78] Wright et al., *supra* note 69 at 710.

[79] *Id.* at 702.

36

- In Virginia, after a white judge was accused of assaulting a Black woman, he tried the case himself, jailed the woman overnight, and forced her husband to pay the court fees.[80]

- In Alabama, a Black woman sued a group of whites who had beaten her.[81] The court then gave the woman a choice: withdraw the complaint or be imprisoned.[82]

- Florida Klansmen forced their way into the home of Samuel and Hannah Tutson. Once inside, they snatched Hanna's baby from her arms and threw him onto the floor, causing him severe injuries. Hanna was then dragged outside where she was tortured and repeatedly raped. When the Tutsons later tried to hold the perpetrators civilly accountable in state court—even providing the perpetrators' identities—the Klansmen went unpunished and the Tutsons were jailed.[83]

---

[80] EJI at 70.

[81] Wright et al., *supra* note 69 at 702.

[82] *Id.*

[83] H.R. Rep No. 42-22, 59 (1872).

Congress was not only aware of these problems, § 1983 was in fact created *specifically* to address them.

### b. The 1866 Act: Congress Gets Tough

Against the backdrop of rampant violence, lawlessness, and public corruption in the South during Reconstruction, Senator Lyman Trumbull of Illinois introduced the Civil Rights Act of 1866 (the "1866 Act").[84] Intended to ensure equal protection under the law for all Americans, this landmark legislation played a crucial role in affirming and vindicating the rights of newly freed Black Americans. It declared that all persons born in the United States were citizens, regardless of race, color, or previous condition of servitude; guaranteed certain rights to all citizens, including the right to make contracts, sue, give evidence in court, and inherit, purchase, lease, sell, hold, and convey real and personal property; and empowered the federal government to intervene when states failed to protect these rights—providing for criminal penalties against those who violated them.

---

[84] Civil Rights Act of 1866, Ch. 31, § 1, 14 Stat. 27.

Introduced in the House on January 5, 1866, it was the subject of much controversy. Supporters passionately argued it was necessary to protect the rights of Black Americans against oppressive state laws and officials, while opponents vociferously railed against it as an unconstitutional extension of federal power. Debate in the Senate was equally contentious, with opponents like Senator Garrett Davis of Kentucky arguing that the Act would undermine states' rights and lead to federal tyranny.[85] Undeterred however, Senator Trumbull defended the Act, urging his colleagues to support it as essential for enforcing the 13th Amendment and securing the rights of freedmen.

Following lengthy debate, the Act passed both chambers of Congress only to then be vetoed by President Andrew Johnson,[86] who voiced concerns that Section 2 of the Act[87] would cause "judges of the State courts

---

[85] CONG. GLOBE 39th Cong., 1st Sess. 523, 576, 595 (1866) (statements of Sen. Davis).

[86] *See Historical Highlights: The Civil Rights Bill of 1866,* U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES. Johnson's repeated obstruction of civil rights legislation was one reason he was impeached. *See* Constitution Annotated, *President Andrew Johnson and Impeachable Offenses* at n.6.

[87] "[A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant

who should render judgments in antagonism with [Section 2's] terms" to "be brought before other tribunals and there subjected to fine and imprisonment for the performance of the duties which such State laws might impose."[88] He also chided Section 2 for what he perceived as "invad[ing] the judicial power of the State," while asserting that "adequate judicial remedies could be adopted to secure the desired end … without assailing the independence of the judiciary, always essential to the preservation of individual rights."[89]

Upon revisiting the bill by Congress following Johnson's veto, Senator Trumbull did not hesitate to address its application to judges, stating that a "judge, if he acts corruptly or viciously in the execution or under color of an illegal act, may be and *ought to be punished*,"[90] and continued on to say:

---

of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, … or by reason of his color or race, … shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."

[88] CONG. GLOBE, 39th Cong., 1st Sess. 1680 (1866).

[89] *Id.*

[90] *Id.* at 1758 (emphasis added).

> The assumption that State judges and other officials are not to be held responsible for violations of United States laws, when done under color of State statutes or customs, is akin to the maxim of the English law that the King can do no wrong. It places officials above the law.[91]

Like the Senate, the House rejected President Johnson's apparent federalism concerns and instead welcomed the ability of federal courts to hold state judges criminally responsible for their *willful* unconstitutional actions. Ohio Representative William Lawrence outright dismissed Johnson's concerns when he pointedly argued that the Supremacy Clause inherently "'invades the judicial power of a State' whenever it undertakes to disregard the national Constitution,"[92] to which he added:

> [I]t is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded.[93]

Representative Lawrence concluded by lambasting Johnson's assertion that mere errors in judgment might result in judges being fined or imprisoned:

---

[91] *Id.* (emphases added).

[92] *Id.* at 1836.

[93] *Id.* at 1837.

41

> [T]his is by no means [Section 2's] purpose or its legal effect. The universal rule of law is that there can be no crime unless there be *willful* wrong … [I]f an officer shall *intentionally* deprive a citizen of a right, knowing him to be entitled to it, then he is guilty of a *willful* wrong which deserves punishment.[94]

Following lengthy debate over the sticking point of opposition—the possible federal prosecution of state judges under <u>Section 2</u>—Johnson's veto was overridden, and the Act passed unchanged.[95] It is now codified under 18 U.S.C. § 242.

### c. The 1871 Act: A Private Civil Remedy Applicable to All State Actors (Yes, *Even Judges*)

Owing to the inability or unwillingness of state and local courts to curb the horrendous acts of domestic terrorism driven by white supremacist ideologies, the Reconstruction South seemed in many ways to be much worse than it had been prior to the Civil War. Amidst this dire situation,[96] General Ulysses S. Grant—former commander of the Union Army—was elected president. Almost immediately after Grant assumed

---

[94] *Id.* (emphases added).

[95] *See* Senate Vote #94 in 1866 (39th Congress).

[96] Highlighting this brutality is the November 1868 massacre of Perry Jeffreys, his wife, and four sons in McDuffie County, Georgia. Their offense? Merely the intention to cast a vote for Grant. EJI *supra* note 68 at 53.

office, Attorney General Amos Akerman and Army Major Lewis Merrill disclosed to Grant the full extent of the South's extreme lawlessness.[97] Grant thereafter determined that immediate, direct federal intervention was required. Moving swiftly, Grant publicly declared that any acts of brutality by the Klan would be met with a robust federal response. He also made clear that putting an end to this violence was paramount:

> [T]here is a deplorable state of affairs existing in some portions of the south demanding the immediate attention of Congress. If the attention of Congress can be confined to the single subject of providing means for the protection of life and property in those sections of the Country where the present civil authority fails to secure that end, I feel that we should have such legislation[.][98]

Congress, heeding Grant's call to "eliminate extralegal violence and protect the civil and political rights of four million freed slaves,"[99] quickly passed the Ku Klux Klan Act of 1871 (the "1871 Act").[100] This act granted

---

[97] Ackerman described these counties as "under the domination of systematic and organized depravity," EJI *supra* note 68 at 26, and Merrill characterized them as a "carnival of crime not paralleled in the history of any civilized community," *id.*

[98] *See President Grant Takes on the Ku Klux Klan,* NAT'L PARK SERV.

[99] *See Historical Highlights: The Ku Klux Klan Act of 1871,* U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES.

[100] Ku Klux Klan Act of 1871, Ch. 22, § 3, 17 Stat. 13, 14.

the President the power to take whatever actions "he may deem necessary" to suppress violence, including suspending the writ of habeas corpus.[101] Section 1 of the Act also created a new private civil remedy to enforce the Fourteenth Amendment's protections against constitutional violations committed by state actors—now 42 U.S.C. § 1983.

As discussed in the following section, the Supreme Court was plainly incorrect when it asserted that "[t]he legislative record [of § 1983] gives no clear indication that Congress meant to abolish wholesale all common-law immunities." *Pierson,* 386 U.S. at 554.

### d. The legislative record makes clear that Congress meant to abolish *all* common-law immunities.

Section 1 of the Act—the origin of what is now § 1983—explicitly designed to parallel the criminal provision of the 1866 Act. Representative Samuel Shellabarger, sponsor of the 1871 Act, described Section 1:

―――――――――――――――

[101] *Id.* § 4, 17 Stat. at 14–15.

The fact that President Grant was entrusted by Congress with this tremendous power speaks volumes about the state of affairs in the South during Reconstruction, as well as Grant's trustworthiness not to abuse this power. And while Grant was far from a perfect man, I believe his steadfast devotion to ensuring that Black Americans were made equal citizens—an absolute prerequisite to America's healing—speaks more to his character than do the scandals that plagued his second term. Sometimes people just do really dumb things and for reasons only they understand.

> The model for [Section 1 of the 1871 Act] will be found in the second section of the act of April 9, 1866, known as the "civil rights act." That section provides a criminal proceeding **in identically the same case** as this one provides a civil remedy for, except that the deprivation under color of State law must, under the [1866] act, have been on account of race, color, or former slavery. This section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to **all people** where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship.[102]

Put another way: Section 1 of the 1871 Act was intended to provide a civil remedy for constitutional violations,[103] while Section 2 of the 1866 Act focused on criminal penalties. And just as with the debates over Section 2 of the 1866 Act, legislative debate about Section 1 of the 1871 Act focused almost exclusively on the potential loss of judicial immunity.[104]

---

[102] CONG. GLOBE, 42nd Cong., 1st Sess. App. at 68 (1871) (emphases added).

[103] *See, e.g., Dalehite v. United States*, 346 U.S. 15, 49 (1953) (dissent) (describing "[t]he civil damage action, prosecuted and adjusted by private initiative" as "one of the law's most effective inducements to … watchfulness and prudence[.]").

[104] Section 2—now 18 U.S.C. § 242—would later be amended by Congress to include a "willfulness" requirement. Congress made this change "in order to make [Section 2] less severe." *Screws v. United States,* 325 U.S. 91, 100 (1945). No such change was ever made to Section 1.

Representative Arthur, of Kentucky, criticized <u>Section 1</u> for what he saw as "overrid[ing] the reserved powers of the States" and argued that "[h]itherto, in all the history of this country and of England, no judge or court has been held liable, civilly or criminally, for judicial acts..."[105] Conceding that "[w]illfulness and corruption" could "create[] a liability" for judges,[106] he nevertheless complained that it went too far:

> Under the provisions of this section every judge in the State court … will enter upon and pursue the call of official duty with the sword of Damocles suspended over him by a silken thread…[107]

Representative Lewis of Kentucky argued that <u>Section 1</u> would "put in jeopardy the officers of the States, though in the conscientious discharge of their duties" because "in certain cases, the judge of a State court, though acting under oath of office, is made liable to a suit in the Federal court and subject to damages for his decision against a suitor, however honest and conscientious that decision may be."[108]

---

[105] CONG. GLOBE, 42nd Cong., 1st Sess. 365 (1871).

[106] *Id.*

[107] *Id.* at 366.

[108] *Id.* at 385.

Those in favor of the 1871 Act responded by condemning "the failure and complicity of the state courts in the terror of the post-Civil War South."[109] Representative Lowe of Kansas lamented that "records of the [state] tribunals are searched in vain for any evidence of effective redress [of federally secured rights],"[110] and Representative Perry of Ohio declared that "judges, having ears to hear, hear not."[111] Other House members expressed similar sentiments:

> [The] courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity.[112]

> [Judges exercise] almost despotic powers … without regard to law or justice.[113]

> The outrages committed upon loyal men there are under the forms of law. It can be summed up in one word: loyal men cannot obtain justice in the courts.[114]

Inevitably, any assertion that "[t]he legislative record gives no clear indication that Congress meant to abolish wholesale all common-law

---

[109] CONG. GLOBE, 42nd Cong., 1st Sess. 374 (1871) (statement of Rep. Lowe).

[110] *Id.*

[111] *Id.* at App. 78 (statement of Rep. Perry).

[112] *Id.* at App. 394 (statement of Rep. Rainey).

[113] *Id.* at App. 186 (statement of Rep. Platt).

[114] *Id.* at App. 277 (statement of Rep. Porter).

immunities," *Pierson,* 386 U.S. at 554 (1967), is manifestly untrue. At best, *the* landmark qualified immunity decision was a bumbling mistake. At worst, it was the product of a conspiracy between *eight* Supreme Court justices to facilitate a grossly unconstitutional power grab. Knowing now what we do, further deference to this wholly fraudulent doctrine—on any grounds—is *indefensible.* Still, "we are a government of laws, not of men, and are governed by what Congress enacted rather than by what it intended." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1077-78 (2020). Fortunately, Congress indeed enacted what it intended under the notwithstanding clause of Section 1, which still remains operative today.

### 2. Under its plain language, *all* common law immunities were abrogated by the 1871 Act.

<u>Section 1</u> of the Act—the foundation of § 1983—reads in relevant part:[115]

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, ==any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,== be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of

---

[115] Civil Rights Act of 1871, § 1, 17 Stat. at 13.

Highlighted above, this notwithstanding clause "clearly signals the drafter's intention that the provisions … override conflicting provisions of any other [law]," *Shomberg* v. *United States*, 348 U.S. 540, 547-548 (1955), and "supersede[s] all other laws" because "[a] clearer statement is difficult to imagine." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (collecting cases). It "pre-empts all state law that stands in its way." *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 584 (1979), and instructs courts that "[t]hey must not give effect to state laws [in] conflict," *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015) (quoting *Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 210, 6 L. Ed. 23 (1824)).

And because "members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation," *Newport v. Fact Concerts,* 453 U.S. 247, 258 (1981), the phrase "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding" was understood by Congress to include common law immunities. *See Vidal v. Philadelphia,* 43 U.S. (2 How.) 127, 183 (1844) ("Custom and usage make the common law of England."); *Strother v. Lucas*, 37 U.S. (12 Peters) 410, 437 (1838) ("Every country has a common law of usage and custom…"); *Wheaton v.*

*Peters,* 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law … in each [state]."). This "very important clause" was "intended to counteract … customs having the force of law[] which sanction the wrongful acts specified." *United States v. Stanley*, 109 U.S. 3, 16 (1883). Doesn't this *exactly* describe state common law immunity to § 1983?

### a. An unauthorized revision deleted this provision.

In 1866, Congress authorized the president "to appoint three persons, learned in the law, as commissioners, to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature" in effect at the time.[116] Seven years later, the commission presented its proposed compilation.[117] But in preparing its compilation the commission made so many (unauthorized) changes to the statutes that the House did not believe Congress would accept the revision. Consequently, Congress fired the commissioners[118] and hired Thomas Jefferson Durant,

---

[116] CONG. GLOBE, 39th Cong., 1st Sess., 74.

[117] *See* Ralph H. Dwan et al., *The Federal Statutes–Their History and Use,* 22 MINN. L. REV. 1008, 1013 (1938).

[118] CONG. GLOBE, 42nd Cong., 3rd Sess., 579.

a Washington, D.C. lawyer, to undo the changes and finalize the revision. Durant's version of the revision was authorized for publication by Congress on June 20, 1874,[119] and was published in 1875. The Revised Statutes of 1874 were an official compilation of included statutes and the Congressional act authorizing its publication stated that once enacted, the Revised Statutes would serve as "legal evidence of the laws and treaties" they contained.[120] However, numerous substantive errors were found once again.

One such error was the omission of the notwithstanding clause from Section 1 of the 1871 Act[121] which had been codified under § 1979 of the Revised Statutes:

> 9 April, 1866, c. 31, s. 1, v. 14, p. 27.
> Civil action for deprivation of rights.
> 20 April, 1871, c. 22, s. 1, v. 17, p. 13.
>
> SEC. 1979. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. [See §§ 563, 629.]

---

[119] CONG. GLOBE, 43rd Cong., 1st Sess., 113.

[120] 18 Stat. at L., part 3, 113, ch. 333.

[121] *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation,* 111 CAL. L. REV. 201, 234-41 (2023) (discussing the unauthorized revision).

Nevertheless, this error did not work a substantive change in the law, because Congress never authorized any such change. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939) (noting that these changes did not "alter the scope of [R.S. § 1979]" with explicit reference to the notwithstanding clause of the 1871 Act); *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 625 (1979) ("The history of the [§ 1983] revision makes abundantly clear that Congress did not intend the revision to alter the content of federal statutory law" because "[t]he Act of Congress authorizing the revision discloses no warrant to do so."); *see also United States v. Welden,* 377 U.S. 95, 98 n.4 (1964) (noting that when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the effect of the law unless Congress explicitly says so).

As discussed in the next part, the notwithstanding clause still remains in effect today.

### b.  Absent repeal, this provision still controls.

When the United States Code was formally enacted in 1925[122] and R.S. § 1979 was codified, the error in the 1874 revision carried over, and

---

[122] *See* Dwan et al., at 1018-19.

the notwithstanding clause of <u>Section 1</u> was omitted. 8 U.S.C. § 43 (1925). This however was not the only error: almost immediately after the Code's inception *hundreds* of other errors in statutes were found.[123] Accordingly, the following year Congress clarified that where there is an inconsistency between a codified statute and the *actual text of legislation as enacted by Congress*, <u>the original enactment controls</u>:

> In all courts […] of the United States […] The matter set forth in the Code, evidenced as hereinafter in this section provided, shall establish prima facie' the laws of the United States […] but nothing in this Act shall be construed as repealing or amending any such law, or as enacting as new law any matter contained in the Code.[124]

> In case of any inconsistency arising through omission […] between the provisions of any section of this Code and the corresponding portion of legislation heretofore enacted[,] effect <u>shall</u> be given for all purposes whatsoever to such enactments.[125]

Statutes under the Code were therefore only to be considered as "prima facie" evidence of the law, because "the very meaning of 'prima facie' is that the Code cannot prevail over the Statutes at Large when the

---

[123] *Id.* at 1020-21.

[124] Act of June 30, 1926, Ch. 712, 44 Stat. 1, § 2(a).

[125] *Id.* (emphasis added).

two are inconsistent." *Stephan v. United States*, 319 U.S. 423, 426 (1943). Even today, 42 U.S.C. § 1983 is only prima facie the law, *see* 1 U.S.C. § 204(a) (titles of the U.S. Code not enacted into positive law only "establish prima facie the laws of the United States"), as it was not enacted into positive law, *id.*, notes. And because it "was [neither] enacted as a statute, nor can it be construed as such," *see Murrell v. W. Union Tel. Co.*, 160 F.2d 787, 788 (5th Cir. 1947), § 1983 "is only a prima facie statement of the statute law," *id.* ("The statutes collected in [the U.S. Code] did not change their meaning nor acquire any new force by their inclusion.").

Importantly, where the prima facie law contains a "palpable error … manifestly inconsistent" with the legislative enactment, then "Congress has specifically provided that the underlying statute *must* prevail." *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 379-80 (1958) (citation omitted) (emphasis added); *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("If construction … [of a section of the United States Code which has not been enacted into positive law] is necessary, recourse must be had to the original statutes themselves." (citing *Murrell,* 160 F.2d at 788)). *See Anderson v. Pac. Coast S.S. Co.,* 225 U.S. 187, 199 (1912) ("[I]t will not be

inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.").

Thus, the notwithstanding clause still controls, present-day § 1983 language notwithstanding.

## II.  The Supreme Court's Section 1983 precedent has *never* been "binding" on this Court nor on any other lower federal court.

The Supreme Court is quick to say that "unless we wish anarchy to prevail within the federal judicial system, [its] precedent[s] … must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982). But anarchy is "a state of society in which there is no *capable supreme power*," *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292-93 (1904) (emphasis added), and this is exactly what the Supreme Court's "binding" § 1983 immunity decisions facilitate.

### A.  *Stare decisis* is a doctrine, not a constitutional mandate.

The Constitution "organizes the government, … assigns, to different departments, their respective powers[,] [and] establish[es] certain limits not to be transcended by those departments." *Marbury,* 5 U.S. (1 Cranch) at 176 (emphasis added). As Chief Justice Marshall explained:

> To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?

*Id.* This means, of course, that "judicial encroachment is as liable to question as legislative or executive." *Kendall v. United States*, 37 U.S. 524, 608 (1838). And *Marbury's* "limits not to be transcended" necessarily apply to the judiciary:

> Would it not be somewhat ironic (and quite unlikely) for the Framers, so concerned with the division and dispersal of power generally, to have concentrated the power to interpret all other powers and to bind all other actors with those interpretations in a single institution or organ of government?[126]

The correct understanding of *Marbury* is framed as a conflict-of-laws assessment, where Chief Justice Marshall was compelled to select from conflicting legal authorities—all of which are outlined in the Supremacy Clause. U.S. CONST., art. VI., cl. 2. But by prioritizing the Constitution over federal statutes, Marshall effectively fulfilled his obligation in the conflict-of-laws analysis.

---

[126] Michael S. Paulsen, *The Irrepressible Myth of Marbury,* 101 MICH. L. REV. 2706, 2738 (2003) ("*Marbury* certainly suggests no such thing; practically every sentence of the opinion points in precisely the opposite direction.").

And if *Marbury* is not dead law, then the argument for judicial review of prior judicial actions *outweighs* that of legislative actions. Unlike statutes passed by Congress and enacted by the President, judicial precedents are not included in the Supremacy Clause—only the Constitution, federal statutes, and treaties are the supreme law of the land.

Did the Framers simply "forget" to include judicial precedents in this list? If they did not, then they *deliberately* omitted them. In either case, the inherent structural superiority of the Constitution and the explicit text of the Supremacy Clause preclude applying *stare decisis* to uphold Supreme Court precedent that intrudes on Congress's legislative power. Given the congressional record, and the language of § 1983 *as enacted*, can it be said with a straight face that *Pierson* and its progeny are not precisely such an intrusion? By all appearances, the Supreme Court simply disregarded what it didn't like about § 1983 so that it could "justify" its usurpation of Congress.

### B. This Court is *obligated* to follow the Constitution above all else—even conflicting Supreme Court precedent.

The standard for determining whether there is an improper interference with the independent power of a branch is whether the alteration prevents or substantially impairs performance by the branch of its essential role in the constitutional system. *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977). But qualified immunity prevents performance by Congress of its sole power "to consider whether it be a case proper for compensation." *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110 (1801).

### 1. The Supreme Court has no constitutional power to disregard a lawful act of Congress, which is exactly what qualified immunity does.

Congress—in the lawful exercise of its Article I power—created 42 U.S.C. § 1983 in 1871. In doing so, it *expressly* abrogated any and all immunity thereunder. This enactment was the exertion of Congress's legislative power, and "[t]he exertion of that power may not be judicially restrained." *McCray v. United States,* 195 U.S. 27, 59 (1904). Congress, having "directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984), therefore *sub silentio* divested the Supreme Court of any power to create immunity from thin

58

air. And because Congress has spoken, Article III compels the lower federal courts to act accordingly: "that is the end of the matter; for the court […] must give effect to the unambiguously expressed intent of Congress." *Id.*

Further, because the Supreme Court has the power of final review over cases brought under § 1983 *only* because Congress has granted it such power, *see* 28 U.S.C. § 1254, the plain language of the 1871 Act—especially in light of its clear legislative intent in enacting it—is the supreme law of the land. So, to the extent that the Supreme Court's § 1983 precedent conflicts with Congress's Article I power, such precedent is meaningless. It is no more "binding" on lower federal courts than would be a decision on some issue that was rendered by the highest court in Italy.

### 2. Every federal judge takes a constitutionally mandated oath to support the Constitution, not clearly erroneous precedent.

The Constitution's oath-of-office requirement, U.S. CONST., art. VI, cl. 3, means that all judicial officers are "bound by Oath or Affirmation, to support this Constitution," *id.* To this end, each justice or judge of the United States takes the following oath or affirmation before performing the duties of his or her office:

> I, […], do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the

59

> poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me […] under the Constitution and laws of the United States. So help me God.

28 U.S.C. § 453. Importantly, this oath admits of no exceptions. It doesn't say, "except where Supreme Court precedent conflicts with a lawful act of Congress." This is because "[p]reserving the separation of powers is one of this Court's most weighty responsibilities." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 696 (2015). As such, courts may *not* hesitate to "enforce the Constitution's mandate 'that one branch of the Government may not intrude upon the central prerogatives of another.'" *Id.* (quoting *Loving* v. *United States*, 517 U.S. 748, 757 (1996)).

Likewise, the words "faithfully and impartially discharge and perform all the duties incumbent … under the Constitution and laws of the United States" do not require—or even *permit*—blind acquiescence to clearly erroneous Supreme Court precedent. Marshall in fact underscored this sentiment in *Marbury* when he emphatically questioned why a judge would swear to uphold the Constitution if it didn't govern his actions:

> Why otherwise does it direct the judges to take an oath to support it? This oath certainly applies, in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments,

> and the knowing instruments, for violating what they swear
> to support!

*Marbury,* 5 U.S. at 180. And so, just as the Oath Clause *requires* judges to prioritize the Constitution over conflicting statutes, it likewise requires them to prioritize the Constitution over conflicting judicial precedents:

> [T]he notion that the Supreme Court's decisions are final and binding on all other actors in our constitutional system, no matter what, so that all that really matters in constitutional law is the Supreme Court's decisions and precedents [] is utterly groundless as a matter of first principles of the Constitution.[127]

"The distinction, between a government with limited and unlimited powers, is abolished, if […] acts prohibited and acts allowed, are of equal obligation." *Marbury,* 5 U.S. at 176. Is it not? It logically follows therefore that if "the judicial power" is fundamentally the power to decide cases in accordance with law, *id.* at 178, and the Constitution holds the highest position in our legal system as the supreme law, ranking above all other asserted sources of law, U.S. CONST., art. VI, cl. 2, then Supreme Court

---

[127] *See* Paulson, *supra* note 126 at 2724 (discussing that this "myth finds no support in the text, structure, or history of the Constitution.").

precedent—being regarded as "law"—has "no valid legal status" if it violates the Constitution.[128]

Viewing the "<u>doctrine</u> of *stare decisis,*" *see Dobbs,* 597 U.S. at 223 (emphasis added), in this light, rather than as an "obligation" of lower courts to apply clearly erroneous Supreme Court precedent,[129] is the only way *stare decisis* comports with *Marbury*. Otherwise, "[t]his doctrine would subvert the very foundation of all written constitutions ... [and] would declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory." *See Marbury,* 5 U.S. at 178 (1803).

### C. Only Congress, in the lawful exercise of its Article III power, can mandate lower federal courts' deference to "binding" Supreme Court precedent.

Under our Constitution, the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST., art. III, § 1. According to Article III, Congress—not the Supreme Court—has

---

[128] *See* Gary Lawson, *The Constitutional Case Against Precedent,* 17 HARV. J.L. & PUB. POL'Y 23, 26 (1994).

[129] *See, e.g., Agostini v. Felton,* 521 U.S. 203, 237 (1997) ("requiring" the Courts of Appeals to follow directly controlling Supreme Court precedents).

the exclusive power to regulate proceedings in federal courts. *Wayman v. Southard,* 23 U.S. 1 (1825).

The only exception to this is, of course, where the Supreme Court has original jurisdiction as specially designated in the Constitution. *Railway Co. v. Whitton's Adm'r,* 80 U.S. 270 (1872). But aside from this, "[t]he forms of administering justice, and the duties and powers of courts as incident to the exercise of a branch of sovereign power, must ever be subject to legislative will, and the power over them is unalienable[.]" *United States v. Union Pac. R.R.,* 98 U.S. 569, 606 (1878).

And so, where Congress—as is the case with the notwithstanding clause—"makes a plain provision, without making any exception, the courts of justice can make none, as it would be legislating to do so." *Maxwell v. Moore,* 63 U.S. (22 How.) 185, 191 (1859). Likewise, when Congress makes its intent clear—as the § 1983 legislative history unmistakably shows—courts "*must* give effect to that intent." *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215 (1962) (emphasis added). That "[e]very judicial officer, whether of a national or a state court, is under the obligation of an oath so to regard a lawful enactment of Congress," *N. Sec. Co. v. United States,* 193 U.S. 197, 333 (1904), is a function of the

Supremacy Clause, which itself "creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.'" *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 324 (2015) (quoting U.S. Const., art. VI, cl. 2).

Clearly, Congress has created a constitutionally valid rule of decision: common law immunities are abrogated under § 1983. Conversely, there is no rule of decision made by Congress which holds that *Congress's courts* are bound by Supreme Court precedent. And "[w]hen Congress supplies a constitutionally valid rule of decision, federal courts must follow it." *Brown v. Davenport,* 596 U.S. 118, 127 (2022).

"Congress alone has the power to determine whether the judgment of a court of the United States, or competent jurisdiction, shall be reviewed or not," *Ex parte Pa.,* 109 U.S. 174, 176 (1883), which necessarily must also mean that Congress alone has the power to make Supreme Court precedent binding on lower federal courts, at least insofar as the Supreme Court has jurisdiction to construe congressional enactments. So, while Congress certainly *could have* established a rule of decision binding lower federal courts to Supreme Court precedent, as it similarly has done before

in different instances, *see, e.g.,* 28 U.S.C. § 1652 (establishing rule of decision relating to state law binding on federal courts), it *did not.*

## CONCLUSION

> Congress's intent to protect citizens from government abuse cannot be overridden by judges who think they know better. As a doctrine that defies this basic principle, qualified immunity is an unconstitutional error. It is past time for the judiciary to correct this mistake.[130]

Qualified immunity "is one of the most obviously unjustified legal doctrines in our nation's history."[131] It is without any basis in history or law and serves only to elevate certain government officials above the Constitution. Here and now, this Court has been presented with the unique opportunity to fix the Supreme Court's mistake, and to make history in the process. Will it, or will it instead choose to "wait and see" what the Supreme Court does, knowing full well that the Supreme Court is why this mess exists in the first place? Surely, this Court must know that, reasonably, the only way the Supreme Court will ever reverse itself

---

[130] *Green*, No. 3:23-CV-126-CWR-ASH at *3 (S.D. Miss. May 20, 2024).

[131] *See* Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure,* CATO INST. (Sept. 14, 2020). ("Qualified immunity … has no valid legal basis, it regularly denies justice to victims whose rights have been violated, and it severely undermines official accountability, especially for members of law enforcement.").

on qualified immunity is where federal appellate courts finally decide that the Constitution is more important than junk precedent.

What I ask of this Court is simple: restore § 1983—at least in this Circuit—to its rightful place, in order to carry forth Congress's intent that people in this country be protected from government-sanctioned abuse. All that stands in this Court's way is the *myth* that lower federal courts are subservient to clearly unconstitutional Supreme Court precedent, instead of the Constitution that all federal judges swear an oath to uphold.

Today, and every day, I wake up and choose citations, not violence; qualified immunity inherently lends itself to the latter. Ultimately, we either have a system where there is *actual* accountability for those who enforce the law, or we have one that tacitly encourages extrajudicial retribution. This Court now gets to choose which it is.

## STATEMENT OF RELATED CASES

I am unaware of any related cases currently pending in this court.

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(4) and Circuit Rule 32-1 that the attached brief is set in Century font, double-spaced, has a typeface of 14 points, and, according to the word count feature of Microsoft Word 365, contains **13,335** words in total and which are not excluded from the word count under Rule 32-1.

Dated: June 24, 2024

By:   <u>s/ Joseph McGhee</u>
*Pro Se Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on <u>June 24, 2024</u>, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. All participants in the case, excepting Defendant-Appellee Dara Rabin, are registered users and service will be accomplished by the ACMS system.

Service on Defendant-Appellee Dara Rabin will be accomplished by USPS First Class mailing of the foregoing to her at the following address:

> 617 N. Pine Cliff Dr.
> Flagstaff, AZ 86001

Dated: June 24, 2024

By:   <u>s/ Joseph McGhee</u>
*Pro Se Plaintiff-Appellant*